42 A.3d 870

US BANK, N.A., PLAINTIFF–APPELLANT AND CROSS–RESPON-
DENT, v. NIKIA HOUGH, DEFENDANT–RESPONDENT AND
CROSS–APPELLANT, AND MR. HOUGH, HUSBAND OF NIKIA
HOUGH; NEW JERSEY DEPARTMENT OF COMMUNITY AF-
FAIRS; COUNCIL ON AFFORDABLE HOUSING; TOWNSHIP
OF PISCATAWAY; NEW JERSEY HOUSING AND MORTGAGE
FINANCE AGENCY; STATE OF NEW JERSEY; AND THE
COMMONS AT PISCATAWAY, INC., DEFENDANTS.

Argued November 7, 2011—Decided May 22, 2012.

LaVecchia, J., filed a dissenting opinion.

*Diane Bettino* argued the cause for appellant and cross-respondent (*Reed Smith,* attorneys; *Ms. Bettino* and *Paul Bond,* on the briefs).

*Henry A. Loeb* argued the cause for respondent and cross-appellant (*Blumberg & Rosenberg,* attorneys).

*Geraldine Callahan,* Deputy Attorney General, argued the cause for amicus curiae New Jersey Housing and Mortgage Finance Agency (*Paula T. Dow,* Attorney General of New Jersey, attorney).

*Michael J. Fasano* submitted a brief on behalf of amicus curiae New Jersey Land Title Association (*Lomurro, Davison, Eastman & Munoz,* attorneys; *Edward C. Eastman, Jr.,* of counsel; *Mr. Fasano* and *Mr. Eastman,* on the brief).

Justice ALBIN delivered the opinion of the Court.

The Fair Housing Act, *N.J.S.A.* 52:27D–301 to –329.19, is a statutory scheme intended to ensure that municipalities fulfill their constitutional obligation to provide affordable housing to New Jersey's low- and moderate-income residents. Under the Act, the Housing and Mortgage Finance Agency (HMFA) is charged with the responsibility of establishing programs to assist municipalities in meeting their obligation to provide affordable low- and moderate-income housing. *N.J.S.A.* 52:27D–321.

In carrying out its statutory charge, HMFA promulgated regulations controlling the use and sale of affordable housing units. *See N.J.A.C.* 5:80–26.1 to –26.26. One such regulation prohibits a lending institution from issuing a loan—secured by an affordable housing unit—that "exceed[s] 95 percent of the maximum allowable resale price of that unit." *N.J.A.C.* 5:80–26.8(b). To enforce this policy, HMFA declared that "[a]ny loan issued in violation of [these regulatory provisions] shall be void as against public policy." *N.J.A.C.* 5:80–26.18(e).

The bank in this case issued a loan to the owner of an affordable housing unit—secured by a mortgage—in excess of 95% of the allowable resale price of the unit. Notice of the resale-price restriction was set forth in the deed. The unit owner later defaulted on the loan. The Chancery Division declined to void the mortgage or the loan, finding that to do so would result in a windfall to the unit owner.

Giving deference to HMFA's interpretation of its own regulations, the Appellate Division held that the lender's violation of the regulatory scheme required the voiding of the mortgage securing the affordable housing unit, but not the loan or even the amount of the loan in excess of the lawful permissible limits.

We now reverse. Although we accord great deference to a state agency's interpretation of a regulation within the sphere of its expertise, we cannot ignore the clear, straightforward language of *N.J.A.C.* 5:80–26.18(e), which states that the loan violating the maximum permissible limit, not the mortgage, "shall be void as against public policy." HMFA's interpretation of its regulation only permits the voiding of the mortgage, not the unlawful excess portion of the loan. That interpretation is plainly unreasonable because it permits a lending institution to collect the unlawful part of a loan that the regulation declares to be void. Read in a commonsense manner in accordance with its plain language, *N.J.A.C.* 5:80–26.18(e) strips the lending institution of any profit from the unlawful portion of a loan it issues, ensuring both that low- and moderate-income housing unit owners will not be saddled with debts they cannot afford and that lenders will not engage in predatory lending practices.

I.

A.

Defendant Nikia Hough met the limited income requirements for a qualified purchaser of a condominium unit under Piscataway Township's Affordable Housing Program.[1] In January 2004, Hough bought an affordable housing condominium unit for $68,142.86, financing the purchase through a $61,329.00 loan issued

---

[1] We recite here only those parts of the procedural history that are relevant to the disposition of the issue before us. A more detailed discussion of the procedural background can be found in *US Bank, N.A. v. Hough,* 416 *N.J.Super.* 286, 289–92, 3 A.3d 1251 (App.Div.2010).

by Wells Fargo Home Mortgage, Inc.[2] The Uniform Housing Affordability Controls (UHAC) promulgated by HMFA, *N.J.A.C.* 5:80–26.1 to –26.26, and the Township's ordinances controlled the sale and resale price of Hough's condominium unit. The Affordability Controls also prohibit a lending institution from issuing a loan, secured by an affordable housing unit, exceeding 95% of the unit's allowable resale price as set by the Township. *N.J.A.C.* 5:80–26.8(b).

A year later, in March 2005, Hough refinanced her home, which, at the time, by the Township's calculation, had a resale value of approximately $68,735. Mortgage Lenders Network USA, Inc. (Mortgage Lenders) issued a thirty-year loan to Hough in the amount of $108,000.00, with a fluctuating interest rate between 7.8% and 13.8%. In turn, Hough gave Mortgage Lenders a mortgage on the property securing the entire amount of the loan.[3] Both the deed and mortgage referenced the restrictions set forth in Piscataway's affordable housing ordinances. The proceeds from the loan satisfied Hough's pre-existing debts, including monies owed on the Wells Fargo loan and unpaid property taxes, and netted Hough a disbursement of $20,080.45.

Hough did not report, as required by *N.J.A.C.* 5:80–26.8(a), the refinancing to the administrative agent of the Township who ensures compliance with the appropriate laws governing affordable housing. The loan issued by Mortgage Lenders far exceeded the allowable resale price of the condominium unit and violated

---

[2] We use the term "loan" as a substitute for the term "note," which is the document signifying the promise to repay a debt. *See Black's Law Dictionary* 1088–89 (8th ed. 2004). The term "mortgage"—as distinct from "loan"—is used to refer to the document giving the lender a security interest in the property pledged as collateral for repayment of the debt. *See Black's Law Dictionary* 1031 (8th ed. 2004).

[3] The mortgage stated that Mortgage Lenders' nominee, Mortgage Electronic Registration System, Inc., had the right to foreclose on the property for nonpayment of the note.

*N.J.A.C.* 5:80–26.8(b)'s bar against loans that exceed 95% of the maximum allowable resale price of the unit.

By February 2007, Hough defaulted on the loan by failing to make the required monthly payment. The loan and mortgage were assigned to US Bank, which, in June 2007, filed an action to foreclose on the property.[4] In July 2008, US Bank filed an amended foreclosure complaint, naming a number of defendants, including Hough, Piscataway Township, and the New Jersey Housing and Mortgage Finance Agency (HMFA).[5] The complaint sought the sale of the mortgaged property and a declaration that US Bank's mortgage had priority over any other legal interests attached to the property.

In September 2008, US Bank moved for the entry of default against all defendants. Thereafter, Piscataway Township filed an answer basically asserting that the foreclosure action was subject to the Township's affordable housing restrictions in the deed. Through a consent order, US Bank agreed to be bound by those restrictions. In essence, US Bank stipulated that it would not seek a resale price higher than the one allowed by the applicable affordable housing regulations and ordinances and that the unit would be sold only to a qualified buyer.

In January 2009, US Bank filed a notice for entry of final judgment. In March 2009, wrongly believing that a final judgment had already been entered, Hough moved to vacate the non-existent judgment and to dismiss US Bank's complaint on the ground that the loan violated the cap permissible under *N.J.A.C.* 5:80–26.8(b). The Chancery Division did not catch Hough's mis-

---

[4] US Bank was not the legal holder of Hough's debt at the time it filed the complaint. The legal assignment of the debt to US Bank did not occur until July 20, 2007 and was not recorded until August 14, 2007. US Bank's right to prosecute the foreclosure complaint is not an issue in this case.

[5] The amended complaint also named as defendants Hough's non-existent husband, the New Jersey Department of Community Affairs, the Council on Affordable Housing, the State of New Jersey, and the Commons at Piscataway, Inc.

take and denied the motion to vacate. The court reasoned that to void the mortgage or the loan would give Hough an unwarranted windfall.[6]

Hough filed a notice of appeal in July 2009.

## B.

The Appellate Division reversed. *US Bank, N.A. v. Hough,* 416 *N.J.Super.* 286, 289, 3 *A.*3d 1251 (App.Div.2010).[7] The panel rejected Hough's argument that, under *N.J.A.C.* 5:80–26.18(e), US Bank is prohibited from foreclosing on the mortgage or collecting on the unpaid portions of the loan. *Id.* at 297, 3 *A.*3d 1251. The panel also rejected US Bank's proposal that it affirm the Chancery Division's order denying Hough's motion to dismiss the foreclosure complaint. *Id.* at 294–96, 3 *A.*3d 1251.

The panel invited the Attorney General, on behalf of HMFA, to address the issue of the proper interpretation of *N.J.A.C.* 5:80–26.18(e). *Id.* at 292, 3 *A.*3d 1251. HMFA took the position that when a lending institution issues an excessive loan secured by an affordable housing unit, *N.J.A.C.* 5:80–26.18(e) voids only the mortgage, not the underlying indebtedness. *Id.* at 295–97, 3 *A.*3d 1251. Applying principles of agency deference, the panel accepted HMFA's interpretation of its own regulation, finding that it was not "plainly unreasonable." *Id.* at 295, 3 *A.*3d 1251. The panel, however, permitted US Bank to file a separate action to collect on

---

[6] Another Chancery Division judge entered final judgment on the amended complaint in favor of US Bank in December 2009. The court's order set the amount owed to US Bank at $136,516.16, in addition to counsel fees of $1,515.16 and interest, and directed that Hough's property be sold at a Sheriff's sale to satisfy the monies owed.

[7] The appellate panel noted that the appeal was from an interlocutory judgment, not a final judgment. *US Bank, supra,* 416 *N.J.Super.* at 291, 3 *A.*3d 1251. Indeed, the appeal was filed before the entry of final judgment in December 2009. It is not clear whether the Appellate Division was aware of the December 2009 Chancery Division order. Nevertheless, the panel granted leave to appeal "because of the importance of the issue presented." *Id.* at 291–92, 3 *A.*3d 1251.

the unsecured debt. *Id.* at 297, 3 *A.*3d 1251. Thus, US Bank lost its status as a secured creditor but was allowed to pursue a judgment for the full repayment of the loan. *Id.* at 296, 3 *A.*3d 1251.

### C.

We granted US Bank's petition for certification and Hough's cross-petition for certification. *US Bank, N.A. v. Hough,* 205 *N.J.* 184, 13 *A.*3d 1290 (2011). We also granted the motions of the New Jersey Land Title Association and HMFA to participate as amici curiae.

### II.

US Bank concedes that pursuant to *N.J.A.C.* 5:80–26.18(e), the "legal mortgage between [it] and Hough is void." Nevertheless, it submits that the Chancery Division properly exercised its discretion by allowing for an equitable mortgage—as agreed to by US Bank and Piscataway Township—in which the foreclosure on Hough's condominium unit would be subject to the applicable affordable housing restrictions. That is, the property could be sold only to an income qualified buyer and only at a price not higher than the unit's maximum resale price as set by the UHAC regulations. US Bank argues that to read *N.J.A.C.* 5:80–26.18(e) as stripping it of its security interest in the property would constitute not only a "plainly unreasonable" interpretation, but also a violation of the judiciary's constitutional authority to exercise its equitable powers. Under US Bank's construct, it has the right to pursue Hough for the amount of the unpaid loan remaining after the sale of equitably mortgaged property.

Amicus Land Title Association echoes the arguments advanced by US Bank, urging the adoption of the approach taken by the Chancery Division. According to the Association, an equitable mortgage in an amount equal to that allowed by the affordable housing regulations is a compromise that avoids a "forfeiture" by the bank and "unjust enrichment" by the debtor.

On the other hand, Hough argues that *N.J.A.C.* 5:80–26.18(e), properly applied, invalidates both the mortgage and the indebtedness. She reasons that the loan is illegal because it exceeds the maximum resale price of the affordable housing unit as set forth in *N.J.A.C.* 5:80–26.8(b) and that enforcement of the loan and the mortgage, which are inextricably linked, is against public policy as evidenced by the unambiguous language of *N.J.A.C.* 5:80–26.18(e). It is likewise against public policy, Hough contends, to apply an equitable mortgage to undermine a regulation and revive an illegal contract. She declares that HMFA's regulations are intended not only to assist qualified applicants in purchasing affordable housing, but also to protect them from "predatory and illegal lending practices of financial institutions which have vastly superior resources, expertise, sophistication and bargaining power."

Last, amicus HMFA asks this Court to affirm the Appellate Division and to defer to HMFA's interpretation of its own regulation—an interpretation that "void[s] the mortgage that uses the affordable unit as security for an excessive loan." HMFA notes that had US Bank acted with "due diligence" it would have known of the resale restrictions, which were included in a publicly recorded deed. HMFA maintains (1) that its interpretation of the regulation does not result in a forfeiture because US Bank has the opportunity to collect the full amount of the debt as an unsecured creditor; (2) that US Bank should not benefit from an equitable mortgage because it "is at fault for failing to abide by the resale restrictions" of the affordable housing unit; and (3) that Hough should not be unjustly enriched by the voiding of the entirety of the debt she incurred.

## III.

We are called on to interpret the meaning of *N.J.A.C.* 5:80–26.18(e), an administrative regulation that is one part of the enforcement apparatus of the Fair Housing Act, *N.J.S.A.* 52:27D–301 to –329.19. The Act was passed in the wake of this Court's *Mount Laurel* decisions. *L.* 1985, *c.* 222; *see N.J.S.A.* 52:27D–

302(a) (citing *Mount Laurel* decisions within legislative-findings section); *see also S. Burlington Cnty. NAACP v. Twp. of Mount Laurel (Mount Laurel I)*, 67 *N.J.* 151, 336 *A.*2d 713, *cert. denied*, 423 *U.S.* 808, 96 *S.Ct.* 18, 46 *L.Ed.*2d 28 (1975); *S. Burlington Cnty. NAACP v. Twp. of Mount Laurel (Mount Laurel II)*, 92 *N.J.* 158, 456 *A.*2d 390 (1983). Responding to the baneful effects of exclusionary zoning, those decisions required municipalities to provide, through their land use regulations, "a realistic opportunity for the construction of [their] fair share of low and moderate income housing." *Mount Laurel II, supra,* 92 *N.J.* at 220–21, 456 *A.*2d 390.

The goal of the Fair Housing Act is to promote the development of affordable housing in New Jersey. *See N.J.S.A.* 52:27D–303 (declaring that "the statutory scheme . . . comprehends a low and moderate income housing planning and financing mechanism in accordance with regional considerations and sound planning concepts"). To implement the Act, the Legislature created the Council on Affordable Housing, conferring it with authority to "[a]dopt criteria and guidelines" to determine each municipality's fair share of affordable housing. *N.J.S.A.* 52:27D–305(a) and –307(c).

The Legislature also directed the already existing Housing and Mortgage Finance Agency, *N.J.S.A.* 55:14K–4(a), to "establish affordable housing programs to assist municipalities in . . . provid[ing] low and moderate income housing," *N.J.S.A.* 52:27D–321, and to "establish requirements and controls to insure the maintenance of [such] housing," *N.J.S.A.* 52:27D–321(f). In fulfilling its statutory mandate, HMFA promulgated the regulation at issue in this case, *N.J.A.C.* 5:80–26.18(e), which is found in the subchapter entitled "Housing Affordability Controls." Subchapter 26 is intended to "assur[e] that low-and moderate-income units created under the [Fair Housing] Act are occupied by low-and moderate-income households for an appropriate period of time." *N.J.A.C.* 5:80–26.1.

Subchapter 26 sets controls on the purchase and resale price of affordable housing units, *N.J.A.C.* 5:80–26.6, and restricts the sale

of those units only to qualified low- and moderate-income households, *N.J.A.C.* 5:80–26.7.[8] In this case, Piscataway Township officials are the administrative agents responsible for establishing the initial purchase price and maximum resale price of an affordable housing unit. *See N.J.A.C.* 5:80–26.6; *see also N.J.A.C.* 5:80–26.14(c) (noting that "[a] municipality itself . . . may elect to serve as the administrative agent for some or all restricted units in the municipality").

The regulations also protect an affordable housing unit owner from incurring excessive debt by forbidding exorbitant loans secured by a unit. As such, "neither an owner nor a lender shall at any time cause or permit the total indebtedness secured by an ownership unit to exceed 95 percent of the maximum allowable resale price of that unit, as such price is determined by the administrative agent"—here, Piscataway Township officials. *N.J.A.C.* 5:80–26.8(b). In addition, an affordable housing unit owner may not incur an indebtedness secured by the unit "unless and until the administrative agent has determined in writing that the proposed indebtedness complies with the [applicable affordable housing regulations]." *N.J.A.C.* 5:80–26.8(a).

The focal point of this case is the meaning of *N.J.A.C.* 5:80–26.18(e), the enforcement provision that applies when an excessive loan is secured by an affordable housing unit. Before looking at the precise language of the regulation, we turn to our standard of review.

### B.

 When construing a law, we conduct a *de novo* review and do not accord any special deference to a trial court's interpreta-

---

[8] *N.J.A.C.* 5:80–26.7(a) provides that "[l]ow-income ownership units shall be reserved for households with a gross household income less than or equal to 50 percent of median income. Moderate income ownership units shall be reserved for households with a gross household income less than 80 percent of median income."

tion. *Balsamides v. Protameen Chems.*, 160 *N.J.* 352, 372, 734 *A.*2d 721 (1999); *Manalapan Realty, L.P. v. Twp. Comm.*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference."). We interpret a regulation in the same manner that we would interpret a statute. *Bedford v. Riello*, 195 *N.J.* 210, 221–22, 948 *A.*2d 1272 (2008). Determining the intent of the drafter is our paramount goal. *See DiProspero v. Penn*, 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005). Generally, the drafter's intent is found in the actual language of the enactment. *Bedford, supra*, 195 *N.J.* at 221, 948 *A.*2d 1272. Whether construing a statute or a regulation, it is not our function to "rewrite a plainly-written enactment," or to presume that the drafter intended a meaning other than the one "expressed by way of the plain language." *See DiProspero, supra*, 183 *N.J.* at 492, 874 *A.*2d 1039 (internal quotation marks omitted). We cannot rearrange the wording of the regulation, if it is otherwise unambiguous, or engage in conjecture that will subvert its plain meaning. *See ibid.* In short, we must construe the regulation as written.

 Only when a fair "reading of the enactment leads to more than one plausible interpretation" do we look to extrinsic evidence. *Bedford, supra*, 195 *N.J.* at 222, 948 *A.*2d 1272. Such evidence includes the meaning given to the particular regulation by the agency charged with its enforcement. *Ibid.* Significantly, nothing in the history of the rulemaking process leading to the promulgation of *N.J.A.C.* 5:80–26.18(e) sheds light on the meaning of the regulation beyond its plain language.

This appeal does not come to us from a final agency determination, but rather from a judgment of the Chancery Division, which interpreted the regulation without any input from HMFA—a named party in the litigation. The Appellate Division invited the Attorney General, as counsel to HMFA, to offer its interpretation of *N.J.A.C.* 5:80–26.18(e), and we have granted HMFA amicus

status in this appeal. HMFA has offered its opinion concerning the application of *N.J.A.C.* 5:80-26.18(e) to the facts of this case.

When reviewing a final agency decision, we are " 'in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue.' " *Univ. Cottage v. N.J. Dep't of Envtl. Prot.*, 191 *N.J.* 38, 48, 921 *A.*2d 1122 (2007) (quoting *In re Taylor*, 158 *N.J.* 644, 658, 731 *A.*2d 35 (1999)). However, we "defer to an agency's interpretation of ... [a] regulation, within the sphere of [its] authority, unless the interpretation is 'plainly unreasonable.' " *In re Election Law Enforcement Comm'n Advisory Op. No. 01-2008*, 201 *N.J.* 254, 262, 989 *A.*2d 1254 (2010). We do so because "a state agency brings experience and specialized knowledge to its task of administering and regulating a legislative enactment within its field of expertise." *Ibid.*

Even though this appeal does not arise from a final agency determination, HMFA has given its view of the meaning of *N.J.A.C.* 5:80-26.18(e), a regulation that it promulgated and that falls within its sphere of authority. Consequently, we will accord ·due deference to HMFA's interpretation. *See Bedford, supra,* 195 *N.J.* at 222-23, 948 *A.*2d 1272 (giving weight to "long-standing interpretation" of regulation by agency even though agency was not involved in matter); *In re Adoption of a Child by W.P.*, 163 *N.J.* 158, 173-74, 748 *A.*2d 515 (2000) (giving deference to interpretation of statute by agency, which intervened as amicus curiae). Nevertheless, we are not bound by an agency's "plainly unreasonable" interpretation of a regulation. *See In re Election Law Enforcement, supra,* 201 *N.J.* at 262, 989 *A.*2d 1254.

In light of the clear language of *N.J.A.C.* 5:80-26.18(e), we conclude that not only is HMFA's interpretation "plainly unreasonable," but also that the interpretations of the regulation by Hough and US Bank are equally unpersuasive.

## IV.

We begin our analysis by noting that the key facts are essentially undisputed. US Bank's predecessor issued a loan to

Hough secured by her affordable housing unit that exceeded 95% of the maximum allowable resale price of the unit in violation of *N.J.A.C.* 5:80–26.8. Hough did not seek permission from the appropriate Piscataway Township official—the administrative agent—before incurring this indebtedness, also a violation of *N.J.A.C.* 5:80–26.8. Each of the interested parties, however, proposes a different remedy based on the language of *N.J.A.C.* 5:80–26.18(e). Hough contends that both the loan and mortgage should be voided; HMFA contends that only the mortgage should be voided; and US Bank contends that an equitable mortgage covering the maximum resale price of the unit should protect its interest in the property and the remainder of the debt should be collectible by other means.

We conclude that none of the proposed remedies flow from the plain language of the regulation. The language of the regulation itself clearly indicates the remedy that applies when an excessive loan is secured by an affordable housing unit. *N.J.A.C.* 5:80–26.18(e) provides:

> Banks and other lending institutions are *prohibited from issuing any loan secured by owner-occupied real property* subject to the affordability controls set forth in this subchapter, if such loan would be in excess of amounts permitted by the restriction documents recorded in the deed or mortgage book in the county in which the property is located. *Any loan issued in violation of this subsection shall be void as against public policy.*
>
> [*N.J.A.C.* 5:80–26.18(e) (emphasis added).]

We agree with HMFA that, based on the regulation's language, "it is against public policy for a lending institution to issue a loan secured by an affordable unit for an amount in excess of the restricted price." HMFA properly points out that "[t]he deed restrictions are recorded as public documents and, therefore, lending institutions can easily determine whether a unit has a restricted price." Whatever fault may lie with Hough for failing to seek approval from Piscataway Township's administrative agent before taking on the indebtedness, the fact remains that the lender did not exercise simple due diligence before issuing a loan that exceeded the permissible limits under the law.

The regulation—apparently recognizing the disparity in re-
sources between a lending institution and low- and moderate-
income households—concentrates on the excessiveness of the loan
as the chief evil. *See N.J.A.C.* 5:80-26.18(e). A bank can reason-
ably be expected to know that persons who qualify for affordable
housing are unlikely prospects for paying off an exorbitant loan—
one exceeding the maximum resale price of the unit. Indeed, the
issuing of high-risk loans, secured by real property, to borrowers
with insufficient means is one of the principal reasons for the
recent collapse of the real estate market and the filing of mass
foreclosure actions. *See* David Schmudde, *Responding to the
Subprime Mess: The New Regulatory Landscape*, 14 *Fordham J.
Corp. & Fin. L.* 709, 715-27 (2009).

We do not agree with HMFA that "it is the mortgage secured
by the affordable property that offends the regulation" and there-
fore "the purpose of the regulation is met by voiding the mortgage
as against public policy." *N.J.A.C.* 5:80-26.18(e) states that the
"loan issued in violation of this subsection shall be void as against
public policy." Of course, it is the loan secured by the affordable
housing unit—not just any loan—that is at issue. Nevertheless, it
is the excessive loan, not the mortgage, which is void under the
regulation. If the drafters intended the voiding of the mortgage
to be the remedy, the regulation would read: "Any loan issued in
violation of this subsection shall [*result in the voiding of the
mortgage* ] as against public policy."

Words in a statute or regulation make a difference. Business
entities and ordinary people rely on the plain language of laws
when engaging in everyday transactions. We cannot insert quali-
fications into a statute or regulation that are not evident by the
enactment's language. We cannot rewrite the regulation to
achieve some other worthy purpose; we must enforce it as writ-
ten, unless doing so would lead to an absurd result.

Reading the plain language in a commonsense manner leads to a
very unremarkable result. The "loan" that violates the affordable
housing regulations is that part in excess of 95% of the maximum

resale price of the unit. It is the excessive amount that is void as against public policy. If the loan issued had been 95% of the maximum resale price, no one would argue that the loan or mortgage should be void.

HMFA declares that voiding the entirety of the mortgage will ensure that "the unit is not lost to the affordable housing stock." However, the voiding of the mortgage does not achieve that goal. Rather, it is the deed restriction controlling the resale price that will keep the unit in the pool of low- and moderate-income housing. The restriction on the resale price is based on the affordable housing regulations. Accordingly, Hough's unit will remain affordable housing regardless of HMFA's proposed remedy.[9]

Not only does HMFA's interpretation not follow from *N.J.A.C.* 5:80–26.18(e)'s plain language, but that interpretation seemingly would lead to the discordant result of delaying the inevitable. If only the mortgage were voided, then the bank could obtain a judgment against the debtor and execute against the affordable housing unit and whatever other assets the debtor possessed. Although the bank must take additional steps in the march to judgment, the debtor remains underwater.

The regulation, as written, gives the most powerful incentive to a lending institution not to issue an excessive loan to a person who qualifies for affordable housing. Indeed, the regulation strongly discourages predatory lending. Nothing in the language of *N.J.A.C.* 5:80–26.18(e) supports HMFA's supposition that "it is the mortgage secured by the affordable property that offends the regulation and is void as against public policy." For that reason, we find HMFA's interpretation of the regulation "plainly unreasonable." We come to this conclusion while according HMFA full agency deference, and understanding that it will be a rare day

---

[9] This is a point conceded by the Attorney General, appearing for HMFA, during oral argument before this Court.

when an agency cannot give a plausible interpretation for one of its own regulations.

We also find that Hough's argument—that the regulation voids both the entirety of the loan and the mortgage—to be wholly unreasonable in view of the regulation's plain language. Although the language of *N.J.A.C.* 5:80–26.18(e) does not impose any penalty on Hough—despite her own violation of the affordable housing rules by not securing approval for the debt from the administrative agent—the regulation does not reward her with a completely undeserved windfall. There is no reason why Hough should not be responsible for the lawful portion of the loan—the portion representing 95% of the maximum resale price of her unit—or for the mortgage securing that part of her debt. Hough can hardly complain. She will be relieved of repaying $40,000, which represents the part of the loan that is "void as against public policy." *See N.J.A.C.* 5:80–26.18(e).

We likewise consider US Bank's position to be unpersuasive. US Bank asks us to impose an equitable mortgage on the affordable housing unit equal to 95% of the maximum resale price and then allow it to obtain a judgment against Hough for the illegally excessive part of the loan issued to her. The regulation, in our view, does not disturb its mortgage up to the legally permissible limits, so there is no need for an equitable mortgage. Moreover, as already explained, *N.J.A.C.* 5:80–26.18(e) voids the excessive part of the loan as against public policy. No party cites any authority suggesting that the loss of the illicit part of the loan would rise to an unconstitutional forfeiture.

## V.

In conclusion, we reverse the judgment of the Appellate Division, which held that *N.J.A.C.* 5:80–26.18(e) only requires the voiding of the mortgage securing the loan and that US Bank can file a separate action to collect on the unsecured indebtedness. We find that interpretation—the one advanced by HMFA—to be "plainly unreasonable" when viewed against the precise language

of *N.J.A.C.* 5:80–26.18(e). That regulation clearly states that "[a]ny loan issued in violation of [the applicable affordable housing regulations] shall be void as against public policy." Accordingly, the portion of the loan exceeding the permissible limits of *N.J.A.C.* 5:80–26.8(b) is void and not collectible by US Bank. The remainder of the loan is secured by the affordable housing unit.

We remand to the Chancery Division for proceedings in accordance with this opinion.

Justice LaVECCHIA, dissenting.

In a sensible and straightforward opinion, the Appellate Division adopted and applied the Housing and Mortgage Finance Agency's (HMFA) interpretation of a rule enforcing fair housing statutes, for which it is responsible. The Appellate Division's analysis employed established principles of construction that call for judicial deference to an administrative agency's construction of regulations implementing a statutory scheme for which it bears executive responsibility, unless the interpretation is "plainly unreasonable." Substantially for the reasons expressed in the Appellate Division decision, I would affirm the panel's judgment and add only the following additional comments.

I.

In my assessment, HMFA's interpretation of *N.J.A.C.* 5:80–26.18(e) is consistent with the statutory authority granted to HMFA to promulgate uniform housing affordability controls. As HMFA explained, the regulatory enforcement provision was added after lesser enforcement means, which were limited to traditional remedies at law, were viewed as insufficient to deter improper encumbrancing of low-income housing stock. The regulation must be understood and implemented with related regulations generally addressing secured interests in low-income housing stock. If the regulation is fairly read in its entirety and in the overall context in which it operates, there is no "plain language" dissonance with

HMFA's explanation of its intended effect, notwithstanding the majority's contrary assertion.

More to the point, I am not persuaded to join the majority's conclusion that HMFA's interpretation is "plainly unreasonable," an intentionally difficult standard to overcome. *See, e.g., In re Election Law Enforcement Comm'n Advisory Op. No. 01–2008,* 201 *N.J.* 254, 262, 989 *A.*2d 1254 (2010) ("We will defer to an agency's interpretation of both a statute and implementing regulation, within the sphere of the agency's authority, unless the interpretation is 'plainly unreasonable.' "). Our starting premise is that we give "great deference to an agency's interpretation and implementation of its rules enforcing the statutes for which it is responsible." *In re Freshwater Wetlands Prot. Act Rules,* 180 *N.J.* 478, 488–89, 852 *A.*2d 1083 (2004). The majority's repetitive refrain that the agency's interpretation of its regulation's language is "plainly unreasonable" hardly makes it so.

As I see it, the majority's interpretation of *N.J.A.C.* 5:80–26.18(e) suffers from three defects. First, in focusing on the final sentence of the regulation, the majority ignores other language in the regulation that evinces an intent to regulate security interests in affordable housing stock, not the underlying indebtedness undertaken by owners of affordable housing units. Second, the majority overlooks HMFA's statutory authority to develop and administer controls to ensure the continued availability of affordable housing, which undergirds HMFA's regulation. The agency's choice in how to accomplish its statutory charge through this enforcement mechanism guarding the continued availability of affordable housing stock is entitled to deference. The agency's choice of enforcement is not in competition with another policy-laden course of action that this or another court might find preferable. Third and finally, the majority's reading of *N.J.A.C.* 5:80–26.18(e) as voiding only the portion of the illegal security interest in excess of ninety-five percent of the resale price is not dictated by the majority's "plain language" re-interpretation of HMFA's regulation. The majority's remedy is, in essence, simply

a revision of the regulatory enforcement approach chosen by HMFA.

## II.

The controversy in this case began in 2007, when defendant Nikia Hough defaulted on a loan secured by an affordable housing condominium unit. The secured loan on which Hough defaulted was issued in violation of *N.J.A.C.* 5:80–26.8(b), which prohibits loans secured by affordable housing units that exceed ninety-five percent of the maximum allowable resale price of the unit. In the ensuing foreclosure proceeding, the central issue became how the court should apply the enforcement mechanism provided for in *N.J.A.C.* 5:80–26.18(e), which states:

> Banks and other lending institutions are prohibited from issuing any loan secured by owner-occupied real property subject to the affordability controls set forth in the subchapter, if such loan sold be in excess of amounts permitted by the restriction documents recorded in the deed or mortgage book in the county in which the property is located. Any loan issued in violation of this subsection shall be void as against public policy.

Before the Appellate Division, Hough initially argued that the final sentence of *N.J.A.C.* 5:80–26.18(e) should be read so as to void the security interest held by the bank, but conceded that the underlying debt should remain. Later, during reargument, Hough contended that the underlying debt should be declared void as well. Plaintiff US Bank argued that although *N.J.A.C.* 5:80–26.18(e) voids the legal mortgage, it does not affect the underlying indebtedness and does not bar a court from imposing an equitable mortgage to replace the voided legal mortgage.

Faced with those competing interpretations of the regulation, the Appellate Division invited the Attorney General, on behalf of HMFA, to explain the intended operation of *N.J.A.C.* 5:80–26.18(e). Specifically, HMFA was asked to address the final sentence in the regulation that states that "[a]ny loan issued in violation of this subsection shall be void as against public policy," and advise the panel whether it is meant to void the property owner's entire indebtedness, or whether it is limited to voiding

only the underlying mortgage, thereby converting the debt into an unsecured one.

HMFA's response explained the history to the Uniform Housing Affordability Controls (UHAC) of which the disputed regulation is now a part, and set into context the statutory purpose of the regulations. The explanation, rooted in the history to the Fair Housing Act (FHA), *N.J.S.A.* 52:27D–301 to –329, and the regulations enacted to secure compliance with the FHA, bears repeating so that the regulatory language is not interpreted myopically, but rather is construed with due regard for the context in which the provision operates.

As summarized by HMFA, the FHA, which established the Council on Affordable Housing (COAH) to implement an administrative process governing municipal compliance with fair share obligations for affordable housing, simultaneously charged HMFA with responsibility

"to develop and administer controls to ensure the continuing affordability of housing constructed pursuant to the [FHA]." 33 *N.J.R.* 233; 5[2]:27D–321(f). This includes affordable housing that received credit pursuant to COAH regulations and housing receiving funding from the Neighborhood Preservation Balanced Housing Program Fund in the Department of Community Affairs. *N.J.S.A.* 52:27D–321(f). In this way, the Legislature ensured that the three State entities involved with affordable housing coordinate their efforts. In accordance with *N.J.S.A.* 52:27D–321(f), HMFA adopted *N.J.A.C.* 5:80–26 *et seq.* At that time, *N.J.A.C.* 5:80–26 did not include an enforcement provision.

In 2001, HMFA repealed the original regulations at *N.J.A.C.* 5:80–26 and adopted new regulations entitled the Uniform Housing Affordability Controls (UHAC), 33 *N.J.R.* 230(a) and 3432(b); *N.J.A.C.* 5:80–26. The expressed purpose of the UHAC regulations was "to ensure that housing units designated as affordable units under the Fair Housing Act are actually occupied by low- and moderate-income families." *Ibid.* HMFA noted that the original regulations did not include any enforcement provision that would ensure the necessary continued occupancy. 33 *N.J.R.* 232. Accordingly, HMFA adopted *N.J.A.C.* 5:80–26.17 which provided that "[t]he Agency, COAH and the Division hereby reserve, for themselves and for each administrative agent appointed pursuant to this subchapter, all of the rights and remedies available at law and in equity for the enforcement of this subchapter." *N.J.A.C.* 5:80–26.17.

In 2004, HMFA amended its UHAC regulations. 36 *N.J.R.* 3655(a) and 5713(a). As part of its amendments, HMFA re-codified and amended its enforcement provisions. In explaining the 2004 proposal, HMFA noted that the original enforcement provision was insufficient as it "does nothing more than reserve all

rights and remedies currently available at law or in equity for the purpose of enforcing compliance with UHAC." 36 *N.J.R.* 3658. As evidenced by the expanded enforcement provisions, experience had shown HMFA that it was not enough simply to reserve rights and remedies under the law. Accordingly, HMFA re-codified its enforcement section from *N.J.A.C.* 5:80–26.17 to 5:80–26.18 and, in addition to retaining the language of section 17 as *N.J.A.C.* 5:80–26.18(f) and setting forth municipal responsibilities, added the section at issue. *N.J.A.C.* 5:80–26.18(e) provides:

> Banks and other lending institutions are prohibited from issuing any loan secured by owner-occupied real property subject to the affordability controls set forth in [this] subchapter, if such loan would be in excess of amounts permitted by the restriction documents recorded in the deed or mortgage book in the county in which the property is located. Any loan issued in violation of this subsection shall be void as against public policy.

Through this provision, HMFA made it clear that it is against public policy for a lending institution to issue a loan secured by an affordable unit for an amount in excess of the restricted price. The focus of the regulation is the use of an affordable unit to secure an excessive loan. The deed restrictions are recorded as public documents and, therefore, lending institutions can easily determine whether a unit has a restricted price. Accordingly, if a mortgage secured by an affordable unit is given in excess of the permitted amount set forth in the restriction documents, the purpose of the regulation is met by voiding the mortgage as against public policy. If lending institutions are permitted to issue loans in excess of the value of the unit with affordable units as security, foreclosure could result in the loss of affordable units. This is against the enunciated public policy of ensuring that affordable units remain affordable and occupied by lower income households. 36 *N.J.R.* 3655. Thus, it is the mortgage secured by the affordable property that offends the regulation and is void as against public policy. The regulation does not affect the underlying debt as that does not undermine the regulation's purpose.

## III.

HMFA's account of the history and context of *N.J.A.C.* 5:80–26.18(e) reveals that the purpose of the regulation is to deter mortgages on affordable housing units that place at risk the pool of affordable housing stock. The regulation provides an enhanced enforcement mechanism that goes beyond its predecessor regulation's mere preservation of available remedies at law. HMFA's enforcement regulation's concern is not with the unsecured indebtedness of owners of affordable units. An owner of such a unit can take out unsecured loans in any amount. But what the unit owner is prevented from doing through this regulation is to provide a security interest in a low-income housing unit through a bank loan

in an amount in excess of ninety-five percent of the value of the unit. According to HMFA, the regulation deters banks from issuing such loans by rendering the security interest void as against public policy.

That understanding of *N.J.A.C.* 5:80–26.18(e) is in keeping with the statutory grant of authority to HMFA to promulgate regulations "to insure the maintenance of housing assisted under [the FHA] as affordable to low and moderate income households...." *N.J.S.A.* 52:27D–321(f). The FHA gives HMFA authority to act in respect of secured loans on affordable housing units, and not to police loans generally taken out by owners of affordable housing units. It is the taking of a secured loan on the basis of the affordable housing unit that the regulations proscribe and that is what the agency, appropriately, says it addresses in *N.J.A.C.* 5:80–26.18(e). Under a claim of "plain meaning," the majority affords the language in that regulation a reading that fails to take into account the statutory setting for this enforcement regulation.

HMFA's interpretation is not only consistent with its statutory grant of authority, but also accords with related regulations promulgated by HMFA under the FHA and with the language of *N.J.A.C.* 5:80–26.18(e) as a whole. The subchapter of the regulations in which *N.J.A.C.* 5:80–26.18(e) appears begins with the following statement of purpose: "This subchapter is designed to implement the [FHA] by assuring that low- and moderate-income units created under the Act are occupied by low- and moderate-income households for an appropriate period of time." *N.J.A.C.* 5:80–26.1. The regulations that follow only discuss owner indebtedness insofar as that indebtedness is secured by an interest in an affordable housing unit. *N.J.A.C.* 5:80–26.8(a), for example, requires an owner of an affordable housing unit to submit notice to a designated agent, "[p]rior to incurring any indebtedness *to be secured by an ownership unit,*" and subsection (b) of that regulation prohibits an owner or lender from "caus[ing] or permit[ting] the total indebtedness *secured by an ownership unit* to exceed 95 percent of the maximum allowable resale price of the unit."

(Emphasis added). Indeed, the administrative agent to whom enforcement responsibility is delegated must send annual notices to owners reminding them of the proscription against incurring any "refinancing, equity loan, secured letter of credit, or any other mortgage obligation or other debt secured by the unit" unless prior written approval is obtained from the agent. *N.J.A.C.* 5:80–26.18(d)(4)(iii).

Turning to the language of *N.J.A.C.* 5:80–26.18(e) itself, the first sentence of the regulation prohibits "[b]anks and other lending institutions" "from issuing any *loan secured by owner-occupied real property subject to the affordability controls* set forth in this subchapter, if *such loan* would be in excess of amounts permitted. . . ." (Emphasis added). The regulation's second and final sentence, which voids as against public policy "[a]ny loan issued in violation of this subsection," is clearly intended to refer only to those loans prohibited in the first sentence of the regulation, that is, loans secured by affordable housing units that exceed the maximum allowable amount for such loans. In other words, the reference in the final sentence to "[a]ny loan" should reasonably be read, as it reads expressly in the first sentence, as "such loan," meaning that only the secured interest in a loan issued in the prohibited excessive amount is void as against public policy. As HMFA has explained, voiding the security interest held by the bank serves a deterrent purpose. It deters *banks* from issuing such loans. Reducing the secured interest to an amount not exceeding ninety-five percent, as the majority would do, neuters the deterrent effect that HMFA sought for the regulation to accomplish.

The majority's intense interest in the last sentence of the regulation leads it to ignore that the focus of the regulation as a whole is on the security interest in an affordable housing unit, not the underlying indebtedness itself. The underlying unsecured indebtedness never was within the purview of HMFA, through the FHA, to begin with. In my view, far from proving HMFA's interpretation as plainly unreasonable, the majority's reading of

the language of the last sentence loses sight of the context in which the sentence appears. Specifically, the reference to "loan" in the last sentence must be read in light of the regulation in its entirety, in the regulatory context of related rules, and in light of its statutory source of authority to act.

Finally, I am at a loss to understand how the majority can leap from its declared interpretation of the regulation as voiding only a portion of a "loan" (because that is the precise term on which the majority focuses) that is excessive under this regulatory scheme, to a remedy that imposes an equitable mortgage on the property in a lesser amount in order to protect the bank's security interest. The plain-language meaning that the majority ascribes to the term "loan" in the last sentence of the regulation hardly supports the remedy imposed based on this reinterpreted regulatory mechanism.

Although one could question the reasonableness of the majority's interpretation, I need not go that far because it is sufficient for purposes of this appeal to note that the majority's plain language reading fails to demonstrate that the agency has adopted an interpretation of its own regulation that is "plainly unreasonable." Rather, the agency's interpretation emerges as sensible and reasonable; it reconciles the language of the regulation and of the regulatory scheme as a consistent whole, and it is soundly based on the statutory grant of HMFA's authority to regulate in this area. It is entitled to deference and it is HMFA's interpretation of its own regulation that should prevail. *See In re Advisory Op. No. 01-2008, supra,* 201 *N.J.* at 262, 989 *A.*2d 1254.

## IV.

Respectfully, I cannot join the majority's rejection of HMFA's interpretation of its own regulation. In my view, the agency's interpretation is not plainly unreasonable. That other remedies were available do not make the agency's choice plainly unreasonable. That the modifier "such" did not precede the term "loan" in the last sentence is not enough to support a reading of the last

sentence that precludes the interpretation that HMFA ascribes to its own promulgated regulation. I respectfully dissent and would instead affirm the cogent opinion of the Appellate Division.

*For reversal and remandment*—Chief Justice RABNER and Justices ALBIN, HOENS, PATTERSON and Judge WEFING (temporarily assigned)—5.

*For affirmance*—Justice LaVECCHIA—1.