**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0925-17
                          A-1004-17


IN THE MATTER OF THE
NEW JERSEY PINELANDS
COMMISSION'S APPROVAL OF
NEW JERSEY NATURAL GAS'S
APPLICATION (NO. 2014-0045.001)
FOR THE INSTALLATION AND
OPERATION OF THE SOUTHERN
RELIABILITY LINK PROJECT,
COMMISSION RESOLUTION
PC4-17-10

_____

Argued January 20, 2021 – Decided April 29, 2021

Before Judges Yannotti, Haas, and Natali.

On appeal from the New Jersey Pinelands Commission, No. 2014-0045.001.

Daniel A. Greenhouse argued the cause for appellant Sierra Club (Eastern Environmental Law Center, attorneys; Daniel A. Greenhouse, on the brief).

Paul Leodori argued the cause for appellant Pinelands Preservation Alliance (Law Offices of Paul Leodori, PC, attorneys; Amy Huber, on the brief).

Kristina Miles, Deputy Attorney General, argued the cause for respondent New Jersey Pinelands Commission (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Kristina Miles, on the brief).

Dennis J. Krumholz argued the cause for respondent New Jersey Natural Gas Company (Riker, Danzig, Scherer, Hyland & Perretti, LLP, attorneys; Dennis J. Krumholz, of counsel and on the brief; Michael S. Kettler, on the brief).

PER CURIAM

Sierra Club (SC) (A-0925-17) and Pinelands Preservation Alliance (PPA) (A-1004-17) appeal from the final decision of the Pinelands Commission to approve an application by New Jersey Natural Gas Company (NJNG) for the construction and installation of a natural gas pipeline known as the Southern Reliability Link (SRL) within the Pinelands Area. We address both appeals in this opinion. For the following reasons, we affirm.

I.

In 2015, NJNG proposed the construction and installation of the SRL, an approximately thirty-mile, thirty-inch intrastate high-pressure natural gas transmission pipeline to service its existing customers in Burlington, Monmouth and Ocean Counties. The proposed pipeline would connect NJNG's existing natural gas system, which serves its customers in those counties, to a new

2

interstate supply point located in Chesterfield and operated by Transcontinental Pipeline Company (Transco). The SRL would run eastward through Chesterfield, North Hanover, Upper Freehold, Plumsted, Jackson, and Manchester Townships.

As proposed, a 12.1-mile section of the pipeline would cross the State-designated Pinelands Preservation Area running through three municipalities in Ocean County. That portion of the pipeline would be installed almost entirely within existing rights-of-way and roads. The SRL would cross three Pinelands Management Areas: (1) 10.45 miles in the Military and Federal Installation Area on the federal military's Joint Base, McGuire-Dix-Lakehurst (Joint Base); (2) 1.42 miles in a Rural Development Area (RDA); and (3) 0.21 miles in a Regional Growth Area (RGA). NJNG maintains a natural gas distribution system that serves many of the buildings and facilities in the Joint Base's Lakehurst section. Public Service Electric and Gas Company (PSE&G) services the larger remaining section of the Joint Base.

In April 2015, NJNG submitted an application to the Commission seeking approval to construct and install a section of the SRL in the Pinelands Area. NJNG also filed a petition pursuant to N.J.A.C. 14:7-1.4, seeking the Board's approval to install and operate a natural gas pipeline "with a maximum operating

pressure in excess of 250 psig [pounds per square inch gauge] within 100 feet of any building intended for human occupancy" (the Safety Petition); and a petition pursuant to the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163, seeking a determination that the SRL is "reasonably necessary for the service, convenience or welfare of the public," N.J.S.A. 40:55D-19, along with an application to designate a "practicable" route for the pipeline pursuant to N.J.S.A. 48:9-25.4 (the MLUL Petition).

NJNG later revised the SRL's proposed route and submitted an amended application to the Commission and amended petitions to the Board. The Commission's staff reviewed NJNG's amended application pursuant to the coordinated permitting process in the Comprehensive Management Plan (CMP) Rules, N.J.A.C. 7:50-4.81 to -4.85. The staff issued a "certificate of filing" in December 2015, finding the SRL project was consistent with the minimum standards of the CMP. Thereafter, the Commission's Executive Director sent a letter to the Board dated March 10, 2016, stating that the project was consistent with the CMP. Various parties appealed to this court from the Executive Director's determination.

Meanwhile, in January 2016, the Board granted NJNG's petitions. Addressing the MLUL Petition, the Board found that the proposed SRL pipeline

was "reasonably for the service, convenience and welfare of the public pursuant to N.J.S.A. 40:55D-19." The Board noted that the SRL was intended to provide adequate supply, reliability and redundancy to the southern portion of NJNG's service territory, which includes the Joint Base. Thereafter, the Board submitted its record to the Commission, including all public comments and documents submitted as part of its proceedings.[1]

In November 2016, we issued our opinion in In re Petition of South Jersey Gas Co. (SJG), 447 N.J. Super. 459, 465 (App. Div. 2016), a case in which various parties had challenged the Commission's approval of a similar pipeline proposed by South Jersey Gas Company, arguing that the Executive Director did not have authority to issue a final decision on whether a particular use is consistent with the minimum standards of the CMP. We held that only the Commission had "the authority to render final decisions on CMP compliance . . . in the coordinated permitting process." Id. at 477. Consequently, we remanded the matter to the Commission with specific instructions on the manner

---

[1] PPA and SC have filed appeals from the Board's approval of the MLUL Petition. The appeals are docketed under A-3666-15 and A-3752-15. PPA also has appealed from the Board's approval of the Safety Petition. That appeal is docketed as A-2876-15. In opinions filed this date, we affirm the Board's decisions.

in which further proceedings on the application should proceed. Id. at 478-79, 484.

Following our decision in SJG, the Commission filed motions in the pending appeals from the approval of the SRL so it could re-review NJNG's amended application under the same procedural guidelines that we set forth in SJG. We granted the motions, remanded the matters to the Commission, and dismissed the appeals.

At its meeting on June 9, 2017, the Commission adopted Resolution No. PC4-17-10, which set forth its process for determining whether the SRL was consistent with the CMP's minimum standards. In the resolution, the Commission stated it would incorporate the extensive record developed before the Board on the MLUL and Safety Petitions into its own record.

The Commission decided that it would not refer the matter to the Office of Administrative Law (OAL) for an evidentiary hearing, finding that such a hearing was unnecessary in view of the issues to be decided and extensive record already developed. In addition, the Commission established a process for public comment, and stated that a party could request an adjudicatory hearing if the party had a statutory or constitutional basis for such a proceeding.

PPA and certain individuals (Daniel Caruso, Patricia Caruso, and Jean Kovath) then filed requests with the Commission seeking an adjudicatory hearing on NJNG's application. The Commission denied the requests finding that the PPA and the individuals did not have a statutory or constitutional right to an adjudicatory hearing.[2]

Thereafter, at a public hearing conducted in July 2017, forty-five individuals, including representatives from SC and PPA, provided oral comments on NJNG's application. The Commission also received 1319 written comments on the application.

On August 29, 2017, the Executive Director issued a report recommending approval of NJNG's application with conditions to ensure the project would not have any unanticipated adverse impacts on the Pinelands area. The report addressed all public comments and recommended that the Commission find NJNG's proposal was consistent with the minimum requirements of all relevant CMP standards.

---

[2] PPA and the individuals have appealed from the denial of their hearing requests. The appeals were docketed under A-0999-17 and A-1005-18. PPA also has appealed from the adoption of PC4-17-10, and that appeal was docketed as A-4997-16. In opinions also filed this date, we affirm the Commission's adoption of PC4-17-10, and its decisions on the hearing requests.

A-0925-17

While the matter was pending before the Commission, PPA and others submitted separate letters to the Commission's ethics liaison officer and the State Ethics Commission (SEC), asserting that Commissioners Alan Avery and Gary Quinn should be disqualified from participating in the Commission's vote on NJNG's application due to alleged conflicts of interest. The SEC's acting Executive Director determined that neither Commissioner had a conflict of interest requiring recusal.

On September 14, 2017, the Commission approved NJNG's application for the construction and installation of the SRL through the Pinelands Area, subject to conditions suggested by the Executive Director. The Commission noted that it had reviewed the public's comments, the extensive evidentiary record, and the Executive Director's recommendation report.

The Commission found "ample evidence" demonstrating that the proposed installation of the SRL, with the recommended conditions, was consistent with the minimum standards of the CMP. The Commission memorialized its action in Resolution No. PC4-17-27. The Commission also denied a motion to stay installation of the SRL pending appeal. These appeals followed. In July 2020, SC moved before this court for a stay of construction of the pipeline. We denied the motion.

In its appeal, SC argues: (1) the SRL does not meet the CMP's minimum standards for development and land use in a RDA of the Pinelands; (2) the Commission arbitrarily and capriciously decided that the need for the pipeline overrides the importance of protecting wetlands in the Pinelands; (3) the Commission erred by finding that installation of the SRL in forested wetlands and the removal of trees from that area will not result in a substantial impairment to that area; (4) the Commission mistakenly relied on the Board's assessment of the risks of potential pipeline accidents; and (5) the Commission erred by finding that construction of the SRL will not have an irreversible adverse impact on threatened and endangered species and their habitats.

In its appeal, PPA raises the following arguments: (1) the Commission's review process violated due process and the applicable laws; (2) the Commission's approval of the SRL was invalid because two Commissioners participated and voted on the application despite known conflicts of interest; and (3) the Commission's approval of the SRL was arbitrary and capricious because it violates the environmental protections in the Pinelands Protection Act (Pinelands Act), N.J.S.A. 13:18A-1 to -29, and the CMP.

II.

NJNG asserts that construction and installation of the portion of the SRL in the Pinelands Area was completed in January 2020. NJNG therefore argues that the issues that SC and PPA have raised on appeal are moot. It contends a decision in favor of appellants would have no effect at this time and the appeals should be dismissed.

A matter is moot when the requested decision "can have no practical effect on the existing controversy." Redd v. Bowman, 223 N.J. 87, 104 (2015) (quoting Deutsche Bank Nat'l Trust Co. v. Mitchell, 422 N.J. Super. 214, 221-22 (App. Div. 2011)). Dismissal for mootness is appropriate when "a judgment cannot grant effective relief." Caput Mortuum, LLC v. S & S Crown Servs., Ltd., 366 N.J. Super. 323, 330 (App. Div. 2004).

Generally, our courts "do not resolve issues that have become moot due to the passage of time or intervening events." Wisniewski v. Murphy, 454 N.J. Super. 508, 518 (App. Div. 2018) (alteration in original) (quoting State v. Davila, 443 N.J. Super. 577, 584 (App. Div. 2016)). However, "[i]n limited instances, a court will address the merits of an appeal that has become moot 'where the underlying issue is one of substantial importance, [that is] likely to reoccur but capable of evading review.'" Id. at 519 (quoting Zirger v. Gen. Accident Ins. Co., 144 N.J. 327, 330 (1996)). Courts may "decline to dismiss a

matter on mootness grounds in order to address an important matter of public interest." Ibid.

Since the portion of the SRL is the Pinelands Area has been constructed, the issues that SC and PPA have raised on appeal are technically moot. However, SC and PPA have raised issues of substantial importance. Moreover, it is likely the same issues will be raised with regard to other applications, but they would evade review under similar circumstances. Therefore, we will address the issues raised by SC and PPA.

III.

PPA argues that the Commission's approval of NJNG's application should be reversed because two Commissioners who participated in the decision allegedly had disqualifying conflicts of interest. We are not persuaded by PPA's argument.

The Pinelands Act provides in pertinent part that members of the Commission may not participate in matters in which the member has a financial interest. N.J.S.A. 13:18A-17(a). The Act states that "[n]o member, officer, employee, or agent of the commission shall take any official action on any matter in which he has a direct or indirect financial interest . . . ." Ibid. Furthermore, the New Jersey Conflict of Interest Law (COIL) states that:

11

No State officer or employee or special State officer or employee should knowingly act in any way that might reasonably be expected to create an impression or suspicion among the public having knowledge of his acts that he may be engaged in conduct violative of his trust as a State officer or employee or special State officer or employee.

[N.J.S.A. 52:13D-23(e)(7).]

Moreover, N.J.A.C. 19:61-7.4, a regulation adopted pursuant to the COIL, provides in part that:

(d) A State official must recuse himself or herself from an official matter if he or she has:

1. Any financial interest, direct or indirect, that is incompatible with the discharge of the State official's public duties; or

2. Any personal interest, direct or indirect, that is incompatible with the discharge of the State official's public duties.

(e) For purposes of (d) above, an incompatible financial or personal interest includes, but is not limited to . . . a leadership role in a professional or trade organization, which interest might reasonably be expected to impair a State official's objectivity and independence of judgment in the exercise of his or her official duties or might reasonably be expected to create an impression or suspicion among the public having knowledge of his or her acts that he or she may be engaged in conduct violative of his or her trust as a State official.

A-0925-17

In addition, under the common law, a public official is disqualified from participating in proceedings "in which the official has a conflicting interest that may interfere with the impartial performance of his [or her] duties." Paruszewski v. Twp. of Elsinboro, 154 N.J. 45, 58 (1998) (quoting Scotch Plains-Fanwood Bd. of Educ. v. Syvertsen, 251 N.J. Super. 566, 568 (App. Div. 1991)). "The test for disqualification is fact-sensitive and depends on whether, under the circumstances, a particular interest 'had the likely capacity to tempt the official to depart from his sworn public duty.'" Thompson v. City of Atl. City, 190 N.J. 359, 375 (2007) (quoting Van Itallie v. Borough of Franklin Lakes, 28 N.J. 258, 268 (1958)).

Here, the record shows that Avery was the uncompensated Director of the Defense Enhancement Coalition (DEC), a non-profit advocacy group that works with the Joint Base to ensure that the base remains vital to the federal Defense Department and is not subject to closure. It appears that the DEC has supported the construction of the SRL. The record also shows that Quinn served as a member of the Lacey Township governing body when it passed a resolution expressing its interest in having a new gas-fueled power plant constructed on the site of the Oyster Creek nuclear power plant, which was being closed.

13

PPA and some members of the public asserted that Avery and Quinn had disqualifying conflicts of interest which precluded them from participating in the Commission's decision on NJNG's application. The Commission forwarded the matter to the SEC for its review. Mark T. Holmes, the SEC's Acting Executive Director, issued letters dated September 7, 2017, which stated that neither Avery nor Quinn had any real or apparent conflict of interest that would require their recusal from participating in the Commission's consideration of NJNG's application for approval of the SRL.

On appeal, PPA argues the Commission's decision must be reversed because Avery and Quinn improperly participated in that decision. The Commission and NJNG contend, however, that the Pinelands Act only prohibits members of the Commission from participating in matters when the Commissioner has an actual disqualifying financial interest. The Commission and NJNG therefore argue that the Pinelands Act controls and precludes application of the COIL or the common law.

We need not address this issue because, like the SEC, we are convinced neither Avery nor Quinn had an actual or apparent conflict of interest that required their recusal from participating in the Commission's decision on the

14

SRL. Their participation in the Commission's decision was not barred by the Pinelands Act, the COIL, or the common law.

The record shows that Avery did not receive any compensation for his service on the DEC, and he did not participate in any DEC matters after December 12, 2016, which was before the Commission considered and approved the SRL. There also is no evidence in the record that the DEC took an official position on the SRL project before that date, or while the Commission's staff and Executive Director were reviewing NJNG's amended application.

It appears that in October 2016, another member of the DEC's board spoke in favor of the SRL at a public hearing before the New Jersey Department of Environmental Protection (NJDEP). However, that individual was not acting in an official capacity for the DEC.

Avery also has asserted that he did not have any personal involvement in the development of the DEC's positions or statements regarding the SRL. He resigned his position with the DEC in August 2017, which was before the Commission heard public comments and voted on NJNG's application for approval of the SRL.

Furthermore, Quinn did not have a disqualifying conflict of interest arising from his position as a member of the Lacey Township governing body.

A-0925-17

It appears that Quinn expressed support when it was suggested that a new gas-fueled power plant could be constructed on the site of the Oyster Creek power station. Quinn did not, however, express support for the SRL project or comment on whether the SRL would provide natural gas to a new power plant at Oyster Creek.

In addition, Lacey Township did not have a concrete plan for the construction of a new power plant at Oyster Creek, no power company had expressed an interest in building or operating such a facility, and there was no evidence that the SRL was part of any plan to provide gas service to a new power plant.

Thus, Avery and Quinn were not disqualified from participating in the Commission's decision on the SRL. As the SEC correctly determined, neither Avery nor Quinn had a direct or indirect financial or personal interest in the SRL project that would be incompatible with the proper discharge of their official duties as members of the Commission.

IV.

SC and PPA argue that the Commission's approval of the SRL was arbitrary, capricious, and unreasonable. They contend the record does not

support the Commission's finding that the SRL is consistent with the minimum standards of the CMP.

The scope of our review of a final decision of an administrative agency is strictly limited. In re Carter, 191 N.J. 474, 482 (2007). We may reverse an agency's decision only if it is arbitrary, capricious, or unreasonable. In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 385 (2013). Our review of an agency's decision is limited to considering

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Id. at 385-86 (quoting Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995)).]

We are required to affirm an agency's findings of fact if "supported by adequate, substantial and credible evidence." In re Taylor, 158 N.J. 644, 656-57 (quoting Rova Farms Resort, Inc. v. Inv.'s Ins. Co. of Am., 65 N.J. 474, 484 (1974)). We also must "give due deference to the view of those charged with the responsibility of implementing legislative programs." In re Reallocation of Prob. Officer, 441 N.J. Super. 434, 444 (App. Div. 2015) (quoting In re N.J.

Pinelands Comm'n Resol. PC4-00-89, 356 N.J. Super. 363, 372 (App. Div. 2003)).

The Pinelands Act established the Commission, N.J.S.A. 13:18A-4(a), and directed the Commission "to prepare and adopt a comprehensive management plan [(CMP)]" for the different portions of the Pinelands Area. N.J.S.A. 13:18A-8. Among other things, the Act provides that the CMP must be implemented "in a manner that will insure the continued, uniform, and consistent protection of the pinelands area in accord with the purposes and provisions of the [state and federal legislation]." N.J.S.A. 13:18A-8(i).

Accordingly, the Commission adopted the CMP Rules, which established eight specific Pinelands Management Areas with different goals, objectives, development intensities, and permitted uses. N.J.A.C. 7:50-5.11 and -5.12(a). RDAs and Military and Federal Installation Areas are two of the Pinelands Management Areas established by the CMP.

A. RDA.

SC contends the Commission erred by finding the installation of the SRL in the Pinelands was consistent with the CMP Rules for development in a RDA. N.J.A.C. 7:50-5.26(b). SC argues that a natural gas pipeline is not a permitted use in that area, and that the Commission erred by failing to make a finding that

the SRL was "compatible with the essential character of the Pinelands environment." Ibid.

NJNG's application indicates that approximately 1.42 miles of the SRL would be constructed and installed in a RDA. N.J.A.C. 7:50-5.26 governs the minimum standards for development and land use in a RDA and states in relevant part:

> (a) The following uses shall be permitted in a [RDA]:
>
> 1. Residential cluster development . . . .
>
> . . . .
>
> 2. Residential dwelling units . . . .
>
> (b) In addition to the residential uses permitted under (a) above, a municipality may permit any use which is compatible with the essential character of the Pinelands environment and is similar in character, intensity and impact to the following uses:
>
> . . . .
>
> 10. Public service infrastructure except that centralized waste water treatment and collection facilities shall be permitted to service the Rural Development Area only in accordance with N.J.A.C. 7:50–6.84(a)2; . . . .
>
> [(Emphasis added).]

"Public service infrastructure" is defined in the CMP Rules as "gas . . . and other public utilities developed linearly . . . provided or maintained by any public or private entity." N.J.A.C. 7:50-2.11.

SC argues that a use is permitted in an RDA only if it is "similar in character, intensity and impact" to one of the uses enumerated in N.J.S.A. 7:50-5.26, and such use must be "compatible with the essential character of the Pinelands environment." SC contends the Commission erred by concluding that under N.J.S.A. 7:50-5.26, the SRL is a permitted use in a RDA because it is a "public safety infrastructure," and there was no need for the Commission to find the SRL is "compatible with the essential character of the Pinelands environment." We disagree.

According to the CMP Rules, RDAs are management sections of the Pinelands Area that have been "slightly modified" from their natural state and "represent a balance of environmental and development values that is intermediate between the pristine Forest Areas and existing growth areas." N.J.A.C. 7:50-5.13(e). N.J.A.C. 7:50-5.26(b) identifies sixteen uses that are permitted in an RDA, one of which is a "public safety infrastructure." The term "[p]ublic service infrastructure" is defined in the CMP Rules as "gas . . . and

other public utilities developed linearly . . . provided or maintained by any public or private entity." N.J.A.C. 7:50-2.11.

Here, the Commission found that under the regulation, the sixteen enumerated uses are permitted in a RDA. Other uses are permitted in a RDA if they are "compatible with the essential character of the Pinelands environment," and are "similar in character and intensity" with the uses enumerated in the regulation. Since the SRL is a "public safety infrastructure," as defined in N.J.S.A. 7:50-2.11, the Commission found the SRL is a permitted use in a RDA.

We note that we are "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." Ardan v. Bd. of Review, 231 N.J. 589, 604 (2018) (quoting U.S. Bank, N.A. v. Hough, 210 N.J. 187, 200 (2012)). Nevertheless, we will defer to an agency's interpretation of the statute and the regulations it is charged with enforcing "unless the agency's interpretation is plainly unreasonable." Ibid. (quoting In re Election Law Enf't Comm'n Advisory Op. No. 01-2008, 201 N.J. 254, 260 (2010)).

We are convinced that the Commission's interpretation of N.J.S.A. 7:50-5.26(a) is reasonable and consistent with the plain language of N.J.A.C. 7:50-5.26(b). The regulation clearly unambiguously allows the construction of a "public safety infrastructure" in a RDA, and the SRL meets the definition of

21

such a use.  There is no merit to SC's contention that the SRL cannot be constructed in a RDA unless the Commission specifically finds that it is "compatible with the essential character of the Pinelands environment with the essential character of the Pinelands environment <u>and is similar</u> in character, intensity and impact to" the uses permitted in a RDA.  N.J.S.A. 7:50-5.26(b).

B.  <u>Military and Federal Installation Area.</u>

PPA argues the Commission erred by finding the SRL project complied with the CMP Rules for development in a Military and Federal Installation Area. The record shows that approximately 10.45 miles of the SRL will traverse the Joint Base and be located within the Military and Federal Installation Area of the Pinelands.

N.J.A.C. 7:50-5.29 sets forth the minimum standards for development in that area, and states in part:

> (a) Any use <u>associated with the function</u> of the Federal Installation may be permitted in a Military and Federal Installation Area, provided that:
>
> 1. <u>Where feasible</u>, development shall be located in that portion of the installation located within the Pinelands Protection Area;
>
> 2. The use shall not require any development, including public service infrastructure, in the Preservation Area District or in a Forest Area; . . .

[(Emphasis added).]

1. <u>Location Within the Pinelands Preservation Area.</u>

PPA argues that the Commission erred by finding that a portion of SRL may be constructed and installed on the Joint Base in the Preservation Area, rather than in the Protection Area. PPA contends the Commission's finding is inconsistent with N.J.A.C. 7:50-5.29(a)(1). We disagree.

The National Parks and Recreation Act of 1978, 16 U.S.C. § 471i, established the Pinelands National Reserve in New Jersey. The Pinelands Act established the Pinelands Area within the National Reserve, and divided the Pinelands Area into the Preservation and Protection Areas. N.J.S.A. 13:18A-2; -3(j) and (k); -9, and -11(b). Two thirds of the Joint Base, including its entire Lakehurst section where NJNG proposed to construct the SRL, is within the Preservation Area, and one third is within the Protection Area.

The record shows that NJNG considered several alternative routes including a route in the Protection Area, but officials at the Joint Base decided that route would not be feasible. One of the Base Commanders noted that a route through the Protection Area "would have to transverse the range complex[,] an area that has the potential for encountering unexploded ordnance." Two other Base Commanders rejected other routes because of their

23

proximity to "aircraft hangars, hazardous materials storage areas, jet engine fuel storage tanks, munitions storage, live fire ranges and military housing units."

In addition, the Commission's staff rejected an alternative route through the Protection Area. The staff found that selection of this route would require installation of the pipeline in the Forest Area or the Preservation Area District along the pipeline's route outside the Joint Base, which would be contrary to CMP Rules.

Thus, there is sufficient credible evidence in the record to support the Commission's finding that the SRL route through the Preservation Area on the Joint Base was permissible under N.J.A.C. 7:50-5.29(a)(2). The record supports the Commission's determination that alternative routes through the Protection Area were not feasible.

PPA argues, however, that the Commission erred because it failed to consider alternative routes that would have completely avoided the Joint Base. N.J.A.C. 7:50-5.29 does not, however, require the Commission to consider potential routes for installation outside the Joint Base. The Commission was only required to find that routes though the Protection Area were not feasible, and the record supports that finding.

2.  Relationship of the SRL to the Function of the Joint Base.

As noted, N.J.A.C. 7:50-5.29(a) states in part that "[a]ny use associated with the function of the Federal Installation may be permitted" within the Military and Federal Installation Area of the Pinelands. PPA contends the record does not support the Commission's finding that the SRL is "associated with the function" of the Joint Base.

As we noted previously, we defer to an agency's interpretation of the statute and regulations it is charged with enforcing, unless the agency's interpretation is "plainly unreasonable." Ardan, 231 N.J. at 604 (quoting Election Law Enf't Comm'n, 201 N.J. at 260).

Here, the Commission essentially interpreted N.J.S.A. 7:50-5.29(a) to permit development that is "related to the function of the installation." The Commission's interpretation is reasonable. It is consistent with the plain language of the regulation and the ordinary meaning of the phrase "associated with."

In addition, statements by the Joint Base Commanders support the Commission's finding that the SRL will be associated with the function of that facility. In February 2015, Colonel James C. Hodges wrote that the Joint Base was interested in the proposed pipeline because it would provide energy

reliability and redundancy to the facility. Colonel Hodges stated that the SRL would be "absolutely critical" to Joint Base's mission.

Moreover, Colonel Frederick D. Thaden indicated that the "natural gas redundancy" would be a benefit to the Joint Base, and Colonel Neil R. Richardson, who was the Base Commander in 2017, stated that any loss of natural gas supply to the Joint Base would "cripple" its mission. Thus, there is sufficient credible evidence in the record to support the Commission's finding that the SRL is "associated with the function" of the Joint Base.

PPA argues, however, that the SRL is not "associated with the function" of the Joint Base because it will not connect directly with the existing natural gas distribution system at Lakehurst. However, as NJNG points out, this is a distinction without a difference. The SRL will provide natural gas to the Joint Base by means of a connection to the NJNG's distribution system, which serves all of NJNG's customers, including the Joint Base.

The record shows that the SRL will provide reliability and redundancy to NJNG's supply of natural gas to the Joint Base and that the SRL will be capable of providing natural gas to the base in the event of a service disruption. We therefore reject PPA's contentions that the SRL will not be "associated with the function" of the Joint Base.

26

PPA further argues that the Commission's finding lacks support because Colonel Thaden apparently thought that the SRL would connect directly with the Joint Base. However, Thaden noted that NJNG's customers at the southern end of its service territory were vulnerable to a disruption of gas supply from the single existing connection at the northern end of the service territory. Thaden believed the SRL would address this vulnerability.

Thaden's apparent belief that the SRL would connect directly to the Joint Base is of no consequence. He was of the view that the SRL will provide reliability and redundancy for the supply of natural gas to the Joint Base, and that would be so regardless of whether the SRL is connected directly to the Joint Base.

PPA also contends that the SRL's route through the Joint Base was merely a pretext to secure Commission approval of the pipeline. PPA asserts that installation of a part of the pipeline in the Joint Base was an "afterthought" suggested by the Commission's staff.

In support of this contention, the PPA relies on certain emails, which were exchanged during pre-application discussions between representatives of NJNG and the Commission's staff. There was, however, nothing improper about the

A-0925-17

staff suggesting changes to the proposed pipeline route during pre-application discussions to ensure compliance with the CMP Rules.

PPA further argues that the SRL is not "associated with the function" of the Joint Base because the pipeline is designed to transport more gas than the base may require. As the Commission found, however, the SRL will provide a reliable source of natural gas for the Joint Base. The pipeline will be "associated with the function" of the Joint Base even though it will also provide natural gas to NJNG's other customers.

In support of its argument, PPA also relies upon statements in a 2014 Environmental Assessment that the Joint Base's then-current natural gas supply was "a non-interruptible system" and that "supply capacity is not considered an issue for future growth." The statements are not relevant. They do not pertain to the purpose of the SRL, which is to ensure an adequate and reliable source of natural gas to NJNG's customers in the southern end of its service territory, including the Joint Base.

C. Compliance With the CMP's Environmental Standards.

SC and PPA contend the SRL does not comply with the environmental standards for forested wetlands and threatened and endangered species in the

CMP. In addition, PPA argues that the SRL fails to comply with the CMP's minimum environmental standards for water quality.

1. Forested Wetlands.

N.J.A.C. 7:50-6.6 states in pertinent part that: "[d]evelopment shall be prohibited in all wetlands . . . in the Pinelands except as specifically authorized in this Part." N.J.A.C. 7:50-6.13 sets forth five factors that must be met for certain linear improvements to be permitted in wetlands:

> (a) Bridges, roads, trails and utility transmission and distribution facilities and other similar linear facilities shall be permitted in wetlands provided that:
>
> 1. There is no feasible alternative route for the facility that does not involve development in a wetland or, if none, that another feasible route which results in less significant adverse impacts on wetlands does not exist;
>
> 2. The need for the proposed linear improvement cannot be met by existing facilities or modification thereof;
>
> 3. The use represents a need which overrides the importance of protecting the wetland;
>
> 4. Development of the facility will include all practical measures to mitigate the adverse impact on the wetland; and
>
> 5. The resources of the Pinelands will not be substantially impaired as a result of the facility and its

29

> development as determined exclusively based on the existence of special and unusual circumstances.

The record shows that the SRL will run predominantly under existing roadways or shoulders; however, the pipeline will disturb 390.3 square feet of forested wetlands in the Pinelands. Applying the five factors in N.J.A.C. 7:50-6.13, the Commission's staff found that the SRL is permitted in this area. The Commission accepted the staff's analysis.

The Commission found there were no feasible alternative routes for the section of the SRL that would result in the disturbance of fewer wetlands. The Commission determined that the need for gas supply resiliency and redundancy in the southern end of NJNG's service territory could not be met by other existing energy facilities, and this need overrode the importance of protecting affected wetlands.

The Commission also found that NJNG would mitigate the pipeline's impacts upon the wetlands by using Horizontal Directional Drilling (HDD) in construction of the pipeline. The use of HDD would avoid ground impacts and minimize the impact on wetland vegetation that would result from the hand cutting of trees. The Commission found the SRL will not result in a substantial impairment of the resources in the Pinelands. The record supports the Commission's findings.

SC argues, however, that the Commission should not have approved NJNG's application because the removal of trees in a 390.3 square foot area of forested wetland, by its very definition, is a substantial impairment. N.J.A.C. 7:50-6.7 states:

> (a) A significant adverse impact shall be deemed to exist where it is determined that one or more of the following modifications of a wetland will have an irreversible effect on the ecological integrity of the wetland and its biotic components including, but not limited to, threatened or endangered species of plants or animals:
>
> 1. An increase in surface water runoff discharging into a wetland;
>
> 2. A change in the normal seasonal flow patterns in the wetland;
>
> 3. An alteration of the water table in the wetland;
>
> 4. An increase in erosion resulting in increased sedimentation in the wetland;
>
> 5. A change in the natural chemistry of the ground or surface water in the wetland;
>
> 6. A loss of wetland habitat;
>
> 7. A reduction in wetland habitat diversity;
>
> 8. A change in wetlands species composition; or

9. A significant disturbance of areas used by indigenous and migratory wildlife for breeding, nesting, or feeding.

(b) Determinations under (a) above shall consider the cumulative modifications of the wetland due to the development being proposed and any other existing or potential development which may affect the wetland[.]

SC contention lacks sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E). We are convinced that there is sufficient credible evidence in the record to support the Commission's finding that the SRL will not have a "significant adverse impact" upon forested wetlands, as that phrase is defined in N.J.A.C. 7:50-6.7.

2. Threatened and Endangered Species.

SC argues that installation of the SRL will cause irreversible adverse impacts on threatened and endangered species and their habitats in the Pinelands Area, which is not permitted by the CMP Rules. SC contends the Commission did not adequately explain how NJNG will avoid irreversible adverse impacts to the sickle-leaved golden aster, a threatened and endangered plant species.

N.J.A.C. 7:50-6.27(a) states:

No development shall be carried out by any person unless it is designed to avoid irreversible adverse impacts on the survival of any local populations of those plants designated by the Department of Environmental Protection as endangered

32

> plant species pursuant to N.J.A.C. 7:5C-5.1 as well as the following plants, which are hereby found and declared to be threatened or endangered plants of the Pinelands . . . .

One of the plant species listed in the regulations is the sickle-leaved golden aster (Pityopsis falcata, formerly Chrysopsis falcata). N.J.A.C. 7:50-6.27(a)(7).

During its review of the application, the Commission's staff obtained from NJNG reports and information that identified a small population (0.20 acres or 456 plants) of sickle-leaved golden aster in an area of the Joint Base that would be used as "lay-down areas" for the temporary storage and assembly of construction equipment and supplies related to the use of HDD. To address this concern, NJNG revised the SRL project to eliminate the use of HDD for that section of the pipeline.

Instead, NJNG proposed using conventional bore drilling, which would eliminate the need for lay down areas and thereby would avoid any impact on the threatened and endangered plant species. The Commission's staff explained that, with removal of the lay down areas, the SRL "would be installed within the limits of the existing road using a conventional bore installation process. That revision eliminated all potential impacts to the local population of [s]ickle-leaved golden aster."

A-0925-17

After considering all of NJNG's submissions, including surveys, maps, and changes to the planned construction, the Commission's staff concluded, "that given the redesign, and that the proposed natural gas pipeline will be constructed almost entirely within existing rights-of-way and roads, the proposed project will not result in irreversible adverse impact on the survival of the local population of this [threatened and endangered] species." To ensure that no unforeseen impacts occur, the Commission required NJNG to have a biologist for both animal and plant species on site during construction.

On appeal, SC contends the Commission erred by accepting the claim that conventional boring techniques would eliminate any adverse impacts to the sickle-leaved golden aster. SC asserts that the Commission should have requested further information on this issue. It contends NJNG provided no concrete evidence on the effects conventional boring would have on the plants in question.

We are convinced, however, that the Commission reasonably relied upon the technical expertise of its staff in finding that use of conventional bore drilling would avoid adverse impacts to the sickle-leaved golden aster by eliminating the use of HDD in areas where these plants are found. Moreover, as noted, the Commission required NJNG to have a biologist on site during construction to

34

ensure that the installation of the pipeline will not adversely affect the plant species at issue.

3. Water Quality.

PPA contends the Commission erred by approving the SRL without considering whether the pipeline will be constructed in the same general area as two Superfund sites with groundwater contamination in the Joint Base area. PPA argues that the Commission's decision is inconsistent with the CMP Rules.

N.J.A.C. 7:50-6.81 states in pertinent part that the Pinelands Act and the CMP are intended to "protect and maintain the quality of surface and ground water [in the Pinelands environment] through the control and development of land use and close cooperation and coordination with local, state and federal agencies of government." In addition, N.J.A.C. 7:50-6.83 states:

> (a) All development permitted under this Plan . . . shall be designed and carried out so that the quality of surface and ground water will be protected and maintained. . . .
>
> (b) Except as specifically authorized in this Part, no development which degrades surface or ground water quality or which establishes new point sources of pollution shall be permitted.
>
> (c) No development shall be permitted which does not meet the minimum water quality and potable water standards of the State of New Jersey or the United States.

A-0925-17

In addressing the public comments regarding the groundwater contamination of the Superfund sites, the Commission's staff noted that the New Jersey Department of Environmental Protection (NJDEP) and the United States Environmental Protection Agency (USEPA) had addressed the issues related to these sites. The staff stated:

> The NJDEP's review concluded that the pipeline is proposed in areas where there is no soil contamination. The NJDEP notes that there is groundwater contamination in some areas; however, it is 50 to 70 feet below ground surface and the pipeline will not be deeper than 20 feet below ground surface. Therefore, contaminated groundwater will not be encountered. The USEPA reviewed [the Joint Base's] March 2017 Environmental Assessment regarding the project and made a finding of no significant impact.

Thus, the record supports the Commission's finding that the installation of the SRL will not adversely affect the groundwaters or soil in the Pinelands Area. PPA argues, however, that the Commission erred by failing to require additional studies of soil and groundwater contamination, geology, and the water table along the proposed pipeline route.

PPA asserts that the Commission erroneously relied upon "limited studies" previously conducted on the Superfund sites and outdated well testing. PPA contends that without any current or specific evaluation of the soil and ground water contamination along the SRL's route and any construction related

A-0925-17

thereto, the Commission's finding that the SRL will not "cause further issues of contamination is unjustified and unreliable."

PPA's argument lacks sufficient merit to warrant extended comment. R. 2:11-3(e)(1)(E). We are convinced there is sufficient credible evidence in the record to support the Commission's finding that the SRL will not have a significant adverse impact upon the groundwater quality in the Pinelands, and that further testing of the soil and groundwaters along the pipeline route was not required.

D. Reliance on the Board's Findings.

SC argues that the Commission erred by relying on the Board's risk assessments for corrosion, ruptures, and other pipeline accidents. It claims the Commission failed to perform an independent review of the need for the SRL in light of the heightened protections required by the Pinelands Act and the CMP Rules. SC further argues that the Commission erred by relying on the Board's determination that the pipeline will be operated and installed safely.

Our Supreme Court has emphasized the importance of "comity and deference to sibling agencies" where the government oversees "complex and manifold activities that are also the appropriate statutory concern of other governmental bodies." Hinfey v. Matawan Reg'l Bd. of Educ., 77 N.J. 514, 531

(1978).  The Board had the authority and expertise to determine: (1) whether the entire SRL met the applicable safety requirements to be installed and operated "with a maximum operating pressure in excess of 250 [pounds force per square inch gauge pressure] within 100 feet of any building intended for human occupancy," N.J.A.C. 14:7-1.4; (2) whether the SRL was "necessary for the service, convenience or welfare of the public," N.J.S.A. 40:55D-19, and whether the proposed route was "practicable," N.J.S.A. 48:9-25.4.  The Commission reasonably relied upon the Board's decision on these issues.

Nevertheless, the Commission's Executive Director and its staff independently evaluated the SRL in light of the requirements in the Pinelands Act and CMP Rules.  The Commission imposed additional conditions upon its approval to address safety issues, including installation of vales for emergency shutdowns, safety inspections, and protections for T&E species.

Thus, there is no merit to SC's contention that the Commission mistakenly relied upon the Board's assessment of the risks associated with corrosion, ruptures, and pipeline accidents.

## V.

PPA also contends that the Commission's review process violates due process, the Pinelands Act, and the CMP.  We reject these arguments for the

reasons stated in our opinion on the PPA's appeal from the adoption of PC4-17-10 (A-4997-16) and on PPA's appeal from the Commission's denial of its request for an adjudicatory hearing (A-999-17).

We have considered the other arguments raised by SC and PPA and conclude these arguments lack sufficient merit to warrant discussion in this opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0925-17